UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

Case No.: ᴸ₀: ᴸ₀-CV-1374-orl - 37 GJK

UNITED STATES OF AMERICA ex rel.,
JONATHAN MONTES de OCA,

        Plaintiff/Relator,

v.

CONWAY LAKES NC, LLC d/b/a CONWAY
LAKES HEALTH & REHABILITATION
CENTER,  CLEAR CHOICE HEALTH
CARE, LLC, GEOFFREY FRASER,
JEFFREY CLEVELAND and MATTHEW
FILE

        Defendants.

_____/



**FILED UNDER SEAL PURSUANT
TO 31 U.S.C. 3730(b)(2)**

## COMPLAINT PURSUANT TO FALSE CLAIMS ACT (31 U.S.C. § 3730(b)(2))

COMES NOW, UNITED STATES OF AMERICA ex rel. Jonathan Montes de Oca (hereinafter "Relator"), and hereby submits the following Complaint under seal in accordance with the requirements of the False Claims Act, 31 U.S.C. §3730(b)(2).

### I.    NATURE OF THE ACTION

1.    Plaintiff/Relator Jonathan Montes de Oca brings this action on behalf of the United States of America ("United States" or "Government"), to recover treble damages and civil penalties under the False Claims Act (FCA), 31 U.S.C. § 3730(b)(1).

2.    Beginning on or around at least April 2015, and continuing through the filing of this complaint ("relevant period"), Defendants provided remuneration to area physicians to serve as medical directors or physician advisors for Conway Lakes NC, LLC d/b/a Conway Lakes Health & Rehabilitation Center, which is managed by Clear Choice Health Care, LLC, in order



to induce those physicians to refer patients for skilled nursing, rehabilitation and home health services. Such remuneration took the form of payments to the physicians that did not constitute fair market value for the work (if any) the physicians performed as well as other material forms of compensation such as meals, vacations, and paid attendance at celebrity golf tournaments.

3.     Defendants provided this remuneration with the intent to induce future patient referrals from the sham medical directors and physician advisors, and to reward the sham medical directors and physician advisors for past referrals, in violation of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b and the Stark Law, 42 U.S.C. § 1395nn.

4.     Defendants knew they were not entitled to payment from federal payors for services procured in violation of the AKS and/or the Stark Law but developed falsified documentation in an attempt to circumvent such laws.

5.     Relator's claims against Defendants under the FCA are based upon false certifications and false or fraudulent claims that Defendants presented, or caused to be presented, to Medicare for skilled nursing, rehabilitation, and home health services provided to patients who were referred by physicians with whom Defendants had illegal financial relationships under the AKS and/or the Stark Law.

## II.   JURISDICTION AND VENUE

6.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1367(a).

7.     This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because the acts committed by Defendants in violation of the FCA occurred in the Middle District of Florida, and because one or more of Defendants can be found, reside, and/or transact business in the Middle District of Florida.

8.     Venue is proper in the Middle District of Florida under 31 U.S.C. § 3732 and 28 U.S.C. §§ 1391(b) and (c) because a substantial part of the events giving rise to the claims alleged in this action occurred in the Middle District of Florida.

## III.   PARTIES

### A. Relator

9.     Jonathan Montes de Oca ("Relator") is a citizen of the United States and resides in the state of Florida. Relator was employed by Conway Lakes Health and Rehabilitation Center from January 2015, until April 12, 2016.

10.     Relator is an original source of information within the meaning of the False Claims Act, 31 U.S.C. § 3730(e)(4)(B).

### B. Defendants

11.     Conway Lakes NC, LLC, d/b/a Conway Lakes Health & Rehabilitation Center, Medicare Provider ID# 105754, is a Foreign Limited Liability Company with a principal address of 3450 Ridgewood Road, NW, Atlanta, Georgia 30327. The registered agent is listed as CT Corporation System, 1200 South Pine Island Road, Plantation, Florida, 33324. Conway Lakes Health & Rehabilitation Center maintains a physical office at 5201 Curry Ford Road, Orlando, Florida, 32812.

12.     Clear Choice Health Care, LLC, is a Foreign Limited Liability Company with a principal address of 3450 Ridgewood Road, NW, Atlanta, Georgia 30327. The registered agent is listed as CT Corporation System, 1200 South Pine Island Road, Plantation, Florida, 33324. The authorized person listed with the Florida Department of State is Samuel B. Kellett, 3450 Ridgewood Road, NW, Atlanta, Georgia, 30327. Clear Choice Health Care, LLC, serves as the management company of Conway Lakes Health & Rehabilitation Center.

13.     Geoffrey Fraser is a resident of Florida and lives at 4200 S. Tropical Trail, Merritt Island, Florida, 32952. Geoffrey Fraser is part-owner and Senior Vice-President of Clear Choice Health Care, LLC.

14.     Jeffrey Cleveland is a resident of Florida and lives at 961 Stratford Place, Melbourne, Florida, 32940. Jeffrey Cleveland is part-owner and President of Clear Choice Health Care, LLC.

15.     Matthew File is a resident of Florida and lives at 185 Golf Club Drive, Longwood, Florida, 32779. Matthew File is employed as the administrator for Conway Lakes NC, LLC d/b/a Conway Lakes Health & Rehabilitation Center.  Upon information and belief, Matthew File also has some level of ownership in Home Health Care of Florida, LLC.

## C. Co-Conspirators

16.     There are individuals and corporations who are not defendants to this action but were parties to sham Medical Director, Co-Medical Director or Physician Advisor agreements and recipients of illegal kickbacks in exchange for referring patients.  These entities include:

**a. Infectious Disease Consultants, M.D., P.A.**, a Florida professional association with a principal address of 685 Palm Springs Drive, #2A, Palm Springs Medical Center, Altamonte Springs, Florida, 32701. Dr. Jason Sniffen is listed as the president with the same address as the M.D., P.A.

**b. CFP Physicians Group, P.L.**, is a Professional Limited Liability Company with a principal address of 985 State Road 436, Casselberry, Florida, 32707.

**c. Kenneth A. Krumins, M.D.**, is an orthopaedic surgeon affiliated with Jewett Orthopaedic Clinic, and practices at 3451 Technological Avenue, Suite 15, Orlando, Florida, 32817 and 1285 Orange Avenue, Winter Park, Florida, 32789.  Dr. Krumins serves as Medical

Director for Home Health Care of Florida, LLC.

      **d. Christopher D. Cooper. M.D.**, NPI number 1154321057, is an internal medicine and infectious disease physician and is a partner of Infectious Disease Consultants, 685 Palm Springs Drive, Suite 2A, Altamonte Springs, Florida, 32701.  Dr. Cooper is also affiliated with Central Florida Regional Hospital and Florida Hospital Altamonte.

      **e. Jason C. Sniffen, D.O.**, NPI number 1982604856, is a doctor of osteopathic medicine and is a partner of Infectious Disease Consultants, 685 Palm Springs Drive, Suite 2A, Altamonte Springs, Florida, 32701. Dr. Sniffen is also the Medical Director of the Hyperbaric Medicine and Wound Care Center and Chair of Infectious Disease for the Florida Hospital system.

      **f. Venkatesh Nagalapadi, M.D.**, NPI number 1316975964, is a family physician specializing in geriatric medicine and is affiliated with CFP Physicians Group, 985 State Road 436, Casselberry, Florida, 32707 and Central Florida Medical Directors, Inc., which is located at the same address. Dr. Nagalapadi is listed as a medical director of Conway Lakes NC, LLC d/b/a Conway Lakes Health & Rehabilitation Center.

      **g. Ahmad B. Amawi, M.D.**, NPI number 1194761916, is a family physician who operates a small practice with two-to-three other physicians located at 478 E. Altamonte Drive, #108, Altamonte Springs, Florida, 32701. Dr. Amawi specializes in treating Left Ventricular Assist Device (LVAD) patients and is listed as a medical director of Conway Lakes NC, LLC d/b/a Conway Lakes Health & Rehabilitation Center.

## IV.    DEFENDANTS' FRAUD SCHEME

      17.    In January 2015, Relator was hired by Conway Lakes Health & Rehabilitation Center (CLHRC), in an administrative support function.  Relator's role was to assist the human

resources department and medical records department in a variety of manners such as filing documents and generally doing anything he could do to help.

18.     In late March or early April of 2015, Relator transitioned to a new role in accounts payable where he was also designated as the "Compliance Officer" for the building. Relator soon learned the position of Compliance Officer was a position in name alone and not an actual position that required anything of substance from him.

19.     As part of its compliance program the company required two things, first a poster had to be posted in the facility with the "compliance officer's" name and the company's "integrity assurance" hotline information; and, second, employees were made aware of the existence of this hotline via new hire orientation. Because the Compliance Officer position had such minimal and insignificant responsibility, the accounts payable person also served as the Compliance Officer.

20.     The only training Relator received was from Kari Little, former employee of Clear Choice Health Care, LLC. Kari Little instructed Relator to observe her during an orientation session in which she spoke to employees for about five minutes about the integrity assurance line and encouraged employees to call the line if "they think anything is wrong" with respect to patient care and employee misbehavior (such as internal theft, etc.).

21.     In his new position in accounts payable, Relator began observing a flow of monthly invoices and payments for services provided by Medical Directors, Co-Medical Directors and Physician Advisors.

22.     In October 2015, Relator was promoted again to the position of Assistant Administrator to the Administrator, Matthew File.  It was in this new position that Relator learned how the physician invoices drove the company's census numbers.  Relator was a participant in numerous meetings and conference calls with Geoffrey Fraser and Jeffrey

Cleveland where regular and open references were made as to how the monthly payments to physicians drove revenue through patient referrals. During conference calls in which Matthew File and Relator were both present, sometimes monthly, but with no real pattern, Geoffrey Fraser and Jeffrey Cleveland would ask "what are we doing for our docs?" and make other comments showing interest in the volume of census or patient referrals from "our docs."

23.     On January 28, 2016, Matthew File was on vacation and Relator was put in temporary charge of operations. Geoffrey Fraser called Relator and requested to know what he was personally doing to help grow Conway Lakes Health & Rehabilitation Center's census. Geoffrey Fraser asked specifically if Relator had been maintaining contacts with "our docs" and advising them the facility had open beds in need of patients.

24.     In his new position, Relator learned which physicians were paid on a monthly basis as Medical Director, Co-Medical Director or "Physician Advisor." As a result of serving in his various roles for Conway Lakes Health & Rehabilitation Center, Relator also has first-hand knowledge as to how the named physicians are paid on a monthly basis. Each month an invoice is submitted by the respective Medical or Co-Medical Director's practice group, normally signed by the physician, for payment.

25.     For the "Physician Advisor" invoices, Matthew File would generate an invoice from his computer at Conway Lakes Health & Rehabilitation Center and tell Relator simply, "let's make this work."

26.     Relator soon learned that Matthew File meant that the two of them needed to come up with justifications to put on the invoice in order to ensure the physicians got paid. The invoice for the "Physician Advisor" includes a list of services the physician has purportedly provided for the month, with a certain number of hours shown. These hours are multiplied by the

reimbursement rate the "Physician Advisor" is to be paid, yet always adds up to the same monthly amount. The monthly "Physician Advisor" invoices are then emailed to the physicians, or their representatives, so they can sign the invoice. Once all of the signatures were gathered on the monthly invoices, Relator was directed to obtain "corporate approval."

27.     Corporate approval consisted of email approval from Jacquelyn Bartlett, Director of Business Development, and Rebecca Schachter, Director of Corporate Compliance. Jacquelyn Bartlett and Rebecca Schachter would review the invoices and require that "supporting documentation" be provided for each line item listed on the "Physician Advisor" invoices. No such "supporting documentation" was required for the Medical and Co-Medical Director invoices.

28.     In order to assure the invoices were paid so the physicians would continue to refer their patients to Conway Lakes Health & Rehabilitation Center and Home Health Care of Florida, LLC, Relator was directed by Matthew File to generate false support, such as "agendas" for events/meetings purported to have taken place.  These falsified agendas would be attached to monthly invoices and sent to Jacquelyn Bartlett and Rebecca Schachter. Once Ms. Bartlett and Ms. Schachter observed at least one piece of "supporting documentation," they would approve the invoice which would then be paid by Conway Lakes Health & Rehabilitation Center's accounts payable representative. Although Ms. Bartlett and Ms. Schachter required supporting documentation, they were both aware that the Medical Director, Co-Medical Director and "Physician Advisors" were paid the same amount each month and not in relation to any actual services provided.

29.     Relator attended an annual master budgeting meeting where the issue of paying the Medical Director, Co-Medical Director and "Physician Advisors" a fixed monthly amount

was discussed and where both Jacquelyn Bartlett and Rebecca Schachter were in attendance. Relator knows the monthly payment to the physicians was the only budget item that was not variable, but should have been, had the physicians truly been paid for monthly services provided, instead of based on falsified supporting documentation.

30.     One common falsified document that was submitted with most, if not all, of the monthly invoices was the Quality Assurance & Improvement/Risk Management Committee Meeting Signature Sheet (QAIRMCM). This meeting only occurred one time during Relator's year and a half employment with Conway Lakes Health & Rehabilitation Center.

31.     The QAIRMCM was a state regulatory requirement in order for Conway Lakes Health & Rehabilitation Center to maintain its state license for the services it offered. Matthew File also used the QAIRMCM as an opportunity to allocate two hours for QAA each month on each "Physician Advisor" invoice to justify paying the physicians. In order to assure that false documentation was available for the invoices, and to meet state licensure requirements, Matthew File would pass around a sign-in sheet to various employees requiring them to print and sign their names as if a meeting had actually occurred, although it had not. Once all of the employees had signed the sheet, Matthew File would then send the form to the physicians so they could sign as if they had attended the meeting as well, although none of the physicians ever attended any meetings as they did not actually occur. The physicians would then return the document and it would be submitted by Relator with the invoices as supporting documentation for payment.

32.     Relator was able to personally witness and gather documentation evidencing the payments to the Medical Director, Co-Medical Director and "Physician Advisors" as set forth below.

**Dr. Krumins**

33.     One of the first physicians Relator learned was being paid on a monthly basis for referring patients was Kenneth Krumins, M.D., also known as Ken Krumins, of Jewett Orthopaedic Clinic in Orlando, Florida. Dr. Krumins performs many orthopaedic procedures that require patients to have skilled nursing service, home health services, or outpatient therapies.

34.     Dr. Krumins was paid a monthly amount of $3,600.00, first as Co-Medical Director and subsequently as a "Physician Advisor," but provided no actual services to Conway Lakes Health & Rehabilitation Center in consideration for these payments.  Dr. Krumins was influenced by the payments to refer all of his orthopaedic patients to Conway Lakes Health & Rehabilitation Center for both in-patient Medicare services and Part B outpatient services.

35.     Dr. Krumins also serves as the Medical Director of Home Health Care of Florida, LLC.  Upon information and belief, Dr. Krumins receives additional payments from Home Health Care of Florida, LLC, in exchange for patient referrals for home health care.

36.     On March 20, April 20, May 28, June 24, July 20, and August 24, 2015, Conway Lakes Health & Rehabilitation Center made payments of $3,600.00 each month to Dr. Krumins (Composite Exhibit 1).  Dr. Krumins did not actually provide services in fulfillment of his purported role as Medical Director. Payments to Dr. Krumins during this timeframe totaled $21,600.

37.     Sometime in late September of 2015, Relator was told by Matthew File that he had found a physician, whom Matthew File identified as Ahmad Amawi, M.D., who was in a position to refer a sizable amount of patients to Conway Lakes Health & Rehabilitation Center individually and through his practice at Winter Park Family Physicians.  Relator was told by Matthew File that he was going to bring on Dr. Amawi as Co-Medical Director and, based on

corporate policy, would have to thereafter pay Dr. Krumins as a "Physician Advisor" going forward as there could be only one named Medical Director and one named Co-Medical Director.

38.     Relator was directed that Dr. Amawi was to be paid $2,000 per month and that Dr. Krumins monthly payment would remain the same at $3,600 although he was going to be paid as a "Physician Advisor" instead of as Co-Medical Director going forward and would no longer have a written agreement.

39.     On September 30, November 5, and November 24, 2015, Conway Lakes Health & Rehabilitation Center prepared and paid a Physician Advisor Monthly Services Invoice (Composite Exhibit 2) evidencing payments in the amount of $3,600 per month to Dr. Krumins, purporting to show 12 hours of services provided.  However, Dr. Krumins did not provide 12 hours of service to Defendants in any month.  Payments made to Dr. Krumins during this timeframe totaled $10,800.

40.     Matthew File told Relator that as a result of "Medicare bundled payments," Mr. File hoped that Dr. Krumins would refer his patients to Home Health Care of Florida, LLC, since referrals to Skilled Nursing Facilities (SNFs) would reduce drastically as the result of a new payment model being instituted by the Department of Health and Human Services (HHS).

41.     On December 1, 2015, February 10, 2016, February 29, 2016 and March 29, 2016, Conway Lakes Health & Rehabilitation Center paid Dr. Krumins $3,600 each month based upon falsified invoices and supporting documentation (Composite Exhibit 3). Payments made to Dr. Krumins during this timeframe totaled $14,400. During the time period of Relator's employment, Dr. Krumins received payments totaling $46,800, payments which were ongoing at the time Relator left employment with Defendants.

**Dr. Cooper**

42.     The next physician Relator learned was being paid for referrals as a "Physician Advisor" was Christopher (Chris) D. Cooper, M.D.  Dr. Cooper is a partner in Infectious Disease Consultants (IDC) in Altamonte Springs, Florida.  Dr. Cooper was paid a monthly amount of $1,500.00 as a "Physician Advisor," but provided no services to Conway Lakes Health & Rehabilitation Center for the payment.

43.     Dr. Cooper refers patients with a need for skilled nursing services to Conway Lakes Health & Rehabilitation Center and is motivated to do this by the monthly payments as conversations with Matthew File, Geoffrey Fraser and Jeffrey Cleveland made readily apparent. Relator is also aware the monthly payment is made for Dr. Cooper's benefit to Infection Control Consultants, (IDC) c/o Dr. Jason Sniffen, D.O., who is Dr. Cooper's partner at IDC.

44.     On March 20, April 23, May 28, June 24, July 21, and August 26, 2015, Conway Lakes Health & Rehabilitation Center made payments of $1,500 each month to Infection Control Consultants, c/o Jason C. Sniffen, DO, President, for the benefit of Dr. Cooper (Composite Exhibit 4).  The invoices related to these payments, which were created by Defendants, purport to show 5 hours of services provided by Dr. Cooper each month, but for which Relator knows Dr. Cooper did not perform any such services.  Payments made to Dr. Cooper during this timeframe totaled $9,000.

45.     On August 11, 2015, Defendants created a falsified Physician Advisor Meeting Telephone Conference Agenda (Exhibit 5), purporting to show a teleconference between Matthew File, Relator and Dr. Cooper.  This document was provided as supporting evidence for the Physician Advisor Monthly Services Invoice for Dr. Cooper (Exhibit 6) and signed by Matthew File, but such a call never occurred.  A falsified Quality Assurance &

Improvement/Risk Management Committee Meeting Signature Sheet dated August 11, 2015 (Exhibit 7) was also provided as supporting evidence for the Physician Advisor Monthly Services Invoice for Dr. Cooper (Exhibit 6), but such meeting never occurred,

46.     A signature sheet dated September 8, 2015 for a Quality Assurance & Improvement/Risk Management Committee Meeting that never occurred was provided as supporting evidence for the Physician Advisor Monthly Services Invoice for Dr. Cooper for September 2015 (Exhibit 8).

47.     Matthew File told Relator he would occasionally pay for Dr. Cooper and his employees and affiliates to have a special "event." Matthew File told Relator the event would assure a good relationship was maintained with Dr. Cooper and his practice group, Infectious Disease Consultants, who were a consistent Medicare patient referral source. Matthew File told Relator that he would open a tab at a bar, in the amount of $1,500.00, where these "events" were held and would normally pay with his credit card.

48.     In order to "hide" this expense, Matthew File would get reimbursed using a general ledger account of 642302 and classifying the expense as an "Employee Appreciation" expense. Matthew File told Relator that Geoffrey Fraser and Jeffrey Cleveland had directed him to handle these particular "events" in precisely this manner.

49.     On September 18, 2015, an "event" was scheduled for Dr. Cooper and his employees and affiliates at Cuba Libre Restaurant & Rum Bar, 9101 International Drive, Orlando, Florida. Matthew File was unable to attend the event himself so Matthew File asked Relator and another employee, Simon Marquez, to attend in his place. At the time, both Relator and Simon Marquez were Administrators in Training. Dr. Nagalapadi and Frank Mutoka, Director of Rehabilitation for Conway Lakes Health & Rehabilitation Center, attended with

Relator and Simon Marquez. The "event" consisted of an open bar and buffet-style food that was to be paid for by Conway Lakes Health & Rehabilitation Center. At some point during the evening, both Relator and Simon Marquez departed without realizing that one of them was supposed to pay for the event with their credit card. As a result, Dr. Cooper paid for the event himself. The following week Matthew File mentioned to Relator that either he, or Simon Marquez, were supposed to pay for the "event" and expense it as Employee Relations per his instructions. Matthew File then asked Relator to write a check to Dr. Cooper and expense the check (Exhibit 9) to a general ledger account, 639351, and to describe the "event" as a "community/marketing event." Relator called Dr. Cooper later in the week, but Dr. Cooper told Relator that he was going out of town and asked him to call him back whenever he returned. Several weeks later, Relator called Dr. Cooper again and ended up meeting with the physician at Florida Hospital Orlando at which time he gave Dr. Cooper the check for $1,500 (Exhibit 9) drawn on Relator's personal account. Relator did as instructed by Matthew File and was reimbursed for the amount he paid to Dr. Cooper.

50.     Monthly payments to Dr. Cooper continued after this time. In October 6, and November 5, 2015, (Composite Exhibit 10), Conway Lakes Health & Rehabilitation Center continued to pay $1,500 each month to Infection Control Consultants, c/o Jason C. Sniffen, DO, President, for the benefit of Dr. Cooper. The invoices related to these payments purport to show five hours of services provided by Dr. Cooper, for which Relator knows no such services were provided (Composite Exhibit 10).

51.     On November 10, 2015, Matthew File prepared a falsified Quality Assurance & Improvement/Risk Management Committee Meeting Signature Sheet dated November 10, 2015, for a meeting that never occurred (Exhibit 11), which was provided as supporting evidence for

the Physician Advisor Monthly Services Invoice for Dr. Cooper (Exhibit 12). On November 20, 2015, a Physician Advisor Monthly Services Invoice for Dr. Cooper was paid by Conway Lakes Health & Rehabilitation Center (Exhibit 12).

52.    On December 8, 2015, another falsified Quality Assurance & Improvement/Risk Management Committee Meeting Signature Sheet dated December 8, 2015, was falsified for a meeting that never occurred (Exhibit 13), and provided as supporting evidence for the Physician Advisor Monthly Services Invoice (Exhibit 14) for Dr. Cooper.

53.    On December 24, 2015, a Physician Advisor Monthly Services Invoice for Dr. Cooper dated December 24, 2015, was paid by Conway Lakes Health & Rehabilitation Center in the amount of $1,500.00 to Infection Control Consultants, c/o Jason C. Sniffen, DO, President, for benefit of Dr. Cooper, purporting to show five hours of services provided by Dr. Cooper (Exhibit 14). A falsified document titled "December Physician Invoice Supplemental Information" (Exhibit 15) signed by Dr. Cooper on January 21, 2016, but submitted with the Physician Advisor Monthly Services Invoice dated December 24, 2015, (Exhibit 14) was provided as justification for payment.

54.    Another Physician Advisor Monthly Services Invoice for Dr. Cooper dated February 8, 2016, evidencing payment in the amount of $1,500 payable to Infection Control Consultants, c/o Jason C. Sniffen, DO, President, for benefit of Dr. Cooper, purports to show five hours of services provided by Dr. Cooper (Exhibit 16). A document titled "Conway Lakes Re-Admission Reviews" for patients completed by Michael Cohen, M.D., in December 2015, but signed by Dr. Cooper on February 8, 2016 (Exhibit 17), was used as supporting evidence for the Physician Advisor Monthly Services Invoice for Dr. Cooper dated February 8, 2016 (Exhibit 16). This was used as support for paying Dr. Cooper although the actual review was completed by Dr.

Cohen and there was no need for Dr. Cooper to review his work, nor did Dr. Cooper actually do anything other than sign the document.

55.     On February 9, 2016, Matthew File created a falsified Quality Assurance & Improvement/Risk Management Committee Meeting Signature Sheet, for a meeting that never occurred (Exhibit 18), and provided same as supporting evidence for the Physician Advisor Monthly Services Invoice dated February 29, 2016, evidencing payment in the amount of $1,500.00 payable to Infection Control Consultants, c/o Jason C. Sniffen, DO, President, for benefit of Dr. Cooper, purporting to show five hours of services provided by Dr. Cooper (Exhibit 19). A document titled "Conway Lakes Re-Admission Review" for patients completed by Michael Cohen, M.D., and signed by Dr. Cooper on March 2, 2016, (Exhibit 20) was used as supporting evidence for the Physician Advisor Monthly Services Invoice for Dr. Cooper dated February 29, 2016 (Exhibit 19).

56.     Matthew File directed Relator to prepare another falsified document titled "Telephone Conference, Conway Lakes Health & Rehabilitation Center Agenda" dated Friday, March 11, 2016 (Exhibit 21). This document purports to depict a pharmacy medication review. Relator knows this telephone conference did not occur as he was directed by Matthew File to falsify this document, which was then signed by Matthew File and submitted as supporting documentation with the Physician Advisor Monthly Services Invoice for Dr. Cooper (Exhibit 22).

57.     On March 30, 2016, Matthew File directed Relator to create a falsified document titled "Telephone Conference, Conway Lakes Health & Rehabilitation Center Agenda" (Exhibit 23), purporting to show a review of presentation notes for UTI's vs. bacteria that occurred between Matthew File and Dr. Cooper. Relator knows this telephone conference did not occur as

he was directed by Matthew File to falsify this document, which was then signed by Matthew File and submitted as supporting documentation with the Physician Advisor Monthly Services Invoice for Dr. Cooper (Exhibit 22).

58.     On March 31, 2016, a Physician Advisor Monthly Services Invoice for Dr. Cooper dated March 31, 2016, evidencing payment in the amount of $1,500 payable to Infection Control Consultants, c/o Jason C. Sniffen, DO, President, for benefit of Dr. Cooper, purports to show five hours of services provided by Dr. Cooper (Exhibit 22), for which no such services were provided.  In addition, a document titled "Conway Lakes Readmission Review" for patients completed by Michael Cohen, M.D. and signed by Dr. Cooper on March 31, 2016, (Exhibit 24) was used as supporting evidence for the Physician Advisor Monthly Services Invoice for Dr. Cooper (Exhibit 22).   During the time period of Relator's employment, Dr. Cooper received payments totaling $24,000, payments which were ongoing at the time Relator left employment with Defendants.

**Dr. Nagalapadi**

59.     Relator learned in his new position that Conway Lakes Health & Rehabilitation Center was also paying monthly amounts to a physician who was classified as a Medical Director, Vankatesh Nagalapadi, M.D.  Dr. Nagalapadi was paid a monthly amount of $2,500 which was paid to Central Florida Medical Directors/CFP Physicians for his benefit.  Dr. Nagalapadi is listed as the attending physician for the majority of Conway Lakes Health & Rehabilitation Center's patients. Dr. Nagalapadi has agreements with other hospitalist groups for them to refer patients to Conway Lakes Health & Rehabilitation Center.[1]

60.     On March 3, 2015, Conway Lakes Health & Rehabilitation Center made payment in the amount of $2,500 to Dr. Nagalapadi based on being listed as the Medical Director (Exhibit

---

[1] Exhibit 31

25).

61.     Conway Lakes Health & Rehabilitation Center made payments of $2,500 each month to Nagalapadi on April 3, May 3, June 3, July 2, August 2, 2015, September 2, October 1, December 7, 2015, and January 5, 2016 (Composite Exhibit 26).   Payments made to Dr. Nagalapadi during this timeframe totaled $22,500.

62.     Jacquelyn Bartlett emailed Relator and Matthew File, with a copy to Geoffrey Fraser, on July 2, 2015, approving Dr. Nagalapadi and Dr. Krumins's monthly invoices, but questioning various aspects of other invoices (Exhibit 27).   This inquiry was answered by Matthew File in an email reply to Jacquelyn Bartlett and Relator, copied to Geoffrey Fraser, later that day, answering the questions posed during Jacquelyn Bartlett's email (Exhibit 28). Jacquelyn Bartlett responded to Matthew File's answers regarding pharmacy reviews by the various physicians being paid (Exhibit 29).   Matthew File emailed Jacquelyn Bartlett, carbon copied Geoffrey Fraser and Relator, advising her that he would have physicians sign a sheet verifying a review was conducted (Exhibit 30).   The sign in sheets were always fabricated and never represented actual meeting attendees.

63.     In mid-January 2016, Relator became aware of a letter (Exhibit 31) from Central Florida Hospitalist Partners to Conway Lakes Health & Rehabilitation Center, dated January 14, 2016, where the group agreed to refer their unattached patients from all Florida Hospital campuses to CFP Physicians Group, Dr. Nagalapadi's group, for follow-up care at Conway Lakes Health & Rehabilitation Center. By virtue of this letter, Central Florida Hospitalist Partners was advising Conway Lakes to insure that any patients discharged to Conway Lakes Health & Rehabilitation Center by any of the forty-four physicians listed on the second page of the letter, be credited to Dr. Nagalapadi and his group, CFP Physicians Group (Exhibit 31).   Dr.

Nagalapadi's monthly payment of $2,500 resulted in untold new Medicare patients for CLHRC as of January 14, 2016.

64.    Conway Lakes Health & Rehabilitation Center continued to pay Dr. Nagalapadi $2,500 a month on February 3, March 1, April 7, and May 2, 2016 (Composite Exhibit 32). Payments totaling $10,000 were made to Dr. Nagalapadi during this timeframe. During the time period of Relator's employment, Dr. Nagalapadi received payments totaling $37,500, payments which were ongoing at the time Relator left employment with Defendants.

**Dr. Amawi**

65.    Ahmad Amawi, M.D., who specializes in Left Ventricular Assist Device (LVAD) patients, receives a monthly payment of $2,000 from Conway Lakes Health & Rehabilitation Center, ostensibly to serve as Co-Medical Director.  Dr. Amawi was specifically targeted by Matthew File so he would refer LVAD patients to Conway Lakes Health & Rehabilitation Center in exchange for these monthly payments.

66.    Conway Lakes Health & Rehabilitation Center paid Dr. Amawi $2,000 each month on October 15, November 11, and December 14, 2015, and January 11, and February 8, 2016 (Composite Exhibit 33).

**Celebrity Golf Outing**

67.    On December 1, 2015, Relator and Matthew File attended the annual budgeting meeting at Clear Choice Health Care, LLC's office in Melbourne, Florida. During the meeting, Matthew File brought up an upcoming golf tournament, the Diamond Resorts Invitational to benefit Florida Hospital for Children, to the Vice-President of Finance for Clear Choice Health Care, LLC, Scott Peabody, explaining that it was to be held in Orlando, Florida and would cost $25,000 to attend.

68.     The Diamond Resorts Invitational featured an extensive and impressive array of former sports stars and celebrities, including current and former professional baseball greats: Greg Maddux, John Smoltz, Ozzie Smith, Tim Wakefield, Josh Beckett, Justin Verlander, Johnny Damon, Ryan Dempster, Joe Carter, Terry Francona, Tom Glavine, Gaylord Perry, Reggie Jackson, Eric Gagne, and Roger Clemens.  The event also included former NFL stars Marcus Allen, Eric Dickerson, Danny Kannell, Richard Dent, Joe Thiesman, Mark Rypien, Brian Urlacher, Sterling Sharpe, and Jerry Rice, along with hockey legends Mike Eruzione and Jeremy Roenick, and celebrities Alfonso Ribiero, Jack Wagner, comedian Larry the Cable Guy and country singer Jake Owen.

69.     Matthew File explained to Scott Peabody that if Conway Lakes Health & Rehabilitation Center were to send three physicians with high Medicare census from the community, there would likely be an increase in Medicare referrals from those physicians.  In a separate conversation during the same meeting, Matthew File told Jeffrey Cleveland that he, File, would like to send three physicians to the golf tournament and evening gala.  At the time of the December 1, 2015, meeting, Jeffrey Cleveland told everyone that he was uncertain about the event, but that he and Matthew File would discuss at a later date.

70.     Several months after the annual budgeting meeting, Matthew File told Relator that Jeffrey Cleveland had approved the expenditure of $25,000 for the golf sponsorship and that Conway Lakes Health & Rehabilitation Center would be sending a few physicians to the event. In an effort to recruit specific physicians for the event, Matthew File made contact with Michael Cohen, M.D., who was one of the "Physician Advisors" paid a monthly amount by Conway Lakes Health & Rehabilitation Center. Relator knows that Dr. Cohen performed readmission reviews for which Conway Lakes Health & Rehabilitation Center paid him each month. Dr.

Cohen suggested that Matthew File invite Jan C. Parillo, M.D., who is a family physician in Orlando, Florida who had a high amount of Medicare patients and whom Dr. Cohen was friends with. At some point after Matthew File's discussion with Dr. Cohen, Matthew File asked Relator to deliver tickets to the golf tournament/evening gala to Dr. Parillo's office, which he did. Another physician Matthew File invited to the event was Hugh Morris, M.D., of Jewett Orthopaedic Clinic in Winter Park, Florida. Dr. Morris is a partner of Dr. Krumins at Jewett Orthopaedic Clinic. Matthew File explained to Relator that Dr. Morris performed frequent Medicare surgeries and that Dr. Morris would be a great physician to invite to the event as it could result in more referrals for Conway Lakes Health & Rehabilitation Center. Relator is aware that Dr. Morris did in fact begin to refer patients to Conway Lakes Health & Rehabilitation Center following this golf tournament/evening gala event. On February 9, 2016, Matthew File requested an invoice for the $25,000 golf sponsorship via an email to Michael Flaskey, Executive Vice President, Chief Sales and Marketing Officer, Diamond Resorts International (Exhibit 34). An invoice (Exhibit 35) was sent out that same day which was then forwarded to accounts payable and was paid.

71. In addition to paying monthly kickbacks and wining and dining physicians at expensive celebrity golf tournaments, Defendants provided free use of vacation properties to referring physicians.

72. Geoffrey Fraser and Jeffrey Cleveland owned a beach front vacation home in the St. Augustine/Flagler, Florida area. The vacation home was used to provide vacations to physicians on occasion without payment.

73. On April 4, 2016, Relator received a Microsoft Outlook invitation to what was referred to as a "Physician Advisory Committee" meeting (Exhibit 36). The "meeting," which

occurred after Relator left employment with Conway Lakes Health & Rehabilitation Center, was held at The Palm Restaurant in Orlando, Florida. A majority of the co-conspirator physicians were invited, as were other physicians in the community, who could serve as sources of Medicare patient referrals for Conway Lakes Health & Rehabilitation Center. Relator is aware the cost for the food alone was over $7,000 and the "meeting" was strictly a marketing event to gain physician referrals of Medicare patients as Kathleen Miller, Director of Business Development for Conway Lakes Health & Rehabilitation Center, told him "this is strictly an internal referral club" and that she was calling it a "Physician Advisory Committee" strictly for technicality purposes. The main focus of the meeting was to market Conway Lakes Health & Rehabilitation Center and the concept of bundled payments and why physicians should refer their patients to the facility. Defendants covered up the fact that this was a dinner to entice physicians to refer Medicare patients by calling it a "Physician Advisory" meeting should anyone ever take a look at their internal records.

## V.    LEGAL AND REGULATORY FRAMEWORK

### A. The False Claims Act

74.    The False Claims Act or FCA provides for the award of treble damages and civil penalties for, *inter alia,* knowingly submitting, or causing the submission of, false or fraudulent claims for payment to the United States government. 31 U.S.C. § 3729(a)(1).

75.    The FCA provides, in pertinent part, that a person who:

(a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .

(a)(1)(C) conspires to commit a violation of the Act specifically to violate the other subparagraphs which create liability;...

(a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government; . . .

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains. . . .31 U.S.C. § 3729

76.    For purposes of the FCA:

"the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud." 31 U.S.C. § 3729(b).

## B. Medicare

77.    The Medicare program, which Congress enacted in 1965 as Title XVIII of the Social Security Act, pays for the costs of healthcare services for certain individuals.

78.    Health and Human Services (HHS) is responsible for the administration and supervision of the Medicare program, which it does through the Centers for Medicare and Medicaid Services (CMS), an agency of HHS.

79.    Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426A. The Medicare program is divided into four "Parts" that cover different services for beneficiaries. Medicare Part A generally covers inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation care. See 42 U.S.C. §§ 1395c-1395i-4. Part B primarily covers physician and other ancillary services, including some home health services. See 42 U.S.C. § 1395k. This matter involves fraud under both Part A and Part B.

80.     Beginning in November 2006, CMS contracted with Medicare Administrative Contractors ("MACs") to assist in the administration of Medicare Parts A and B. See Fed. Reg. 67960, 68181 (Nov. 2006).  The MACs generally act on behalf of CMS to process and pay Part A and Part B claims and perform administrative functions on a regional level. See 42 § C.F.R. 421.5(b).

81.     In September 2008, First Coast Service Options, Inc. ("First Coast") was awarded a contract to serve as the MAC for the region covering the state of Florida.  They have continued in that role through the date of filing this complaint and serve as the MAC for all of the conduct alleged herein.

82.     Medicare Part A covers up to 100 days of skilled nursing and rehabilitation care for a benefit period (*i.e.*, spell of illness) following a qualifying hospital stay of at least three consecutive days.  42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. § 409.61(b), (c).

83.     In order for rehabilitation therapy provided in a SNF to be covered by Medicare Part A, the following conditions must be met: (1) the patient must require skilled nursing care or skilled rehabilitation services (or both) on a daily basis; (2) the daily skilled services must be services that, as a practical matter, can only be provided in a skilled nursing facility on an inpatient basis; and (3) the services are provided to address a condition for which the patient received treatment during a qualifying hospital stay, or for a condition that arose while the patient was receiving care in a SNF (for a condition treated during the hospital stay). 42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b).

84.     Medicare requires that a physician or certain other practitioners certify that these requirements are met at the time of a patient's admission to the SNF and re-certify the patient's continued need for skilled rehabilitation therapy services at regular intervals thereafter. *See* 42

U.S.C. § 1395f(a)(2)(B); Medicare General Information, Eligibility, and Entitlement Manual, Ch. 4, § 40.3.

85.     For a therapy service to be considered skilled, it must be "so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel." 42 C.F.R. § 409.32(a). Thus, skilled therapy services can only be administered by, or under the supervision of, trained personnel such as physical therapists, occupational therapists, or speech language pathologists. *See* 42 C.F.R. § 409.31(a).

86.     Skilled rehabilitation therapy generally does not include personal care services, such as the general supervision of exercises that have already been taught to a patient or the performance of repetitive exercises (*e.g.*, exercises to improve gait, maintain strength or endurance, or assistive walking). *See* 42 C.F.R. § 409.33(d); *see also* Medicare Benefit Policy Manual, Ch. 8 § 30.4.1.1 ("Skilled physical therapy services must . . . be of a level of complexity and sophistication, or the condition of the patient must be of a nature that requires the judgment, knowledge, and skills of a qualified physical therapist.").

87.     Medicare Part A will only cover those services that are "reasonable" and "necessary." *See* 42 U.S.C. § 1395y(a)(1)(A) ("[N]o payment may be made under part A or part B of this subchapter for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member").

88.     In the context of skilled rehabilitation therapy, "reasonable" and "necessary" means that the services must be (1) consistent with the nature and severity of the patient's individual illness, injury, or particular medical needs; (2) consistent with accepted standards of medical practice; and (3) reasonable in duration and quantity. *See* Medicare Benefit Policy

Manual, Ch. 8, § 30.

89.     In order to assess the reasonableness and necessity of skilled rehabilitation

therapy services and determine whether reimbursement is appropriate, Medicare requires proper

and complete documentation of the services rendered to beneficiaries. In particular, the Medicare

statute provides that:

> The Secretary shall periodically determine the amount which should be paid
> under this part to each provider of services with respect to the services furnished
> by it, and the provider of services shall be paid, at such time or times as the
> Secretary believes appropriate (but not less often than monthly) and prior to audit
> or settlement by the Government Accountability Office, from the Federal Hospital
> Insurance Trust Fund, the amounts so determined, with necessary adjustments on
> account of previously made overpayments or underpayments; *except that no such
> payments shall be made to any provider unless it has furnished such information
> as the Secretary may request in order to determine the amounts due such provider
> under this part for the period with respect to which the amounts are being paid or
> any prior period.* 42 U.S.C. § 1395g(a) (emphasis added).

90.     Under its prospective payment system ("PPS"), Medicare pays a skilled nursing

facility or SNF a pre-determined daily rate for each day of skilled nursing and rehabilitation

services it provides to a patient. *See* 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998).

91.     The daily PPS rate that Medicare pays a nursing facility depends, in part, on the

Resource Utilization Group ("RUG") to which a patient is assigned. Each distinct RUG is

intended to reflect the anticipated costs associated with providing nursing and rehabilitation

services to beneficiaries with similar characteristics or resource needs.

92.     Medicare requires SNFs to periodically assess each patient's clinical condition

and functional status, as well as their actual and expected use of services. SNFs are required to

report the results of these assessments using a standardized tool known as the Minimum Data Set

("MDS").

93.     The MDS is used as the basis for determining a patient's RUG level and,

therefore, the daily rate that Medicare will pay the SNF to provide skilled nursing and skilled therapy to that patient.

94.      In general, a nursing facility must assess each patient and complete the MDS form on the 5th, 14th, 30th, 60th, and 90th day of the patient's stay in the facility. The date the facility performs the assessment is known as the "assessment reference date." A nursing facility may perform the assessment within a window of time before this date or, under certain circumstances, up to five days after. When a nursing facility performs its assessment (except for the first assessment), it looks at the patient for the seven days preceding the assessment reference date. This seven-day assessment period is referred to as the "look-back period."

95.      Completion of the MDS is a prerequisite to payment under Medicare. *See* 63 Fed. Reg. at 26,265. The MDS itself requires a certification by the provider that states, in part: "To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds." MDS Versions 2.0 and 3.0 for Nursing Home Resident Assessment and Care Screening.

96.      A patient's RUG information is incorporated into the Health Insurance Prospective Payment System ("HIPPS") code, which Medicare uses to determine the payment amount owed to the nursing facility. The HIPPS code must be included on the CMS-1450, which nursing facilities submit electronically to Medicare for payment. Medicare Claims Processing Manual, Ch. 25, § 75.5. The amount of Medicare payment will depend largely on the HIPPS code the nursing facility submitted as part of the CMS-1450. *See* 63 Fed. Reg. at 26,267; Medicare Claims Processing Manual, Ch. 25, § 75.5.

97.     SNFs submit the CMS-1450 electronically under Medicare Part A to their MACs (formerly known as Fiscal Intermediaries ("FIs")), who in turn process and pay Medicare Part A claims for skilled nursing and rehabilitation therapy services in SNFs.

**Medicare Home Health Care Benefits**

98.     Home health care is a term describing a wide range of both medical and non-medical services provided to patients in their home.

99.     Under Medicare, the United States pays for certain home health services rendered to Medicare beneficiaries who meet specific coverage requirements.  42 U.S.C. §§ 1395d(a)(3), 1395k(a)(2)(A).  Services covered under this benefit include part-time or intermittent skilled nursing care, speech-language pathology, physical or occupational therapy, part-time or intermittent skilled home health aide services, and medical social services.  42 U.S.C. § 1395x(m).

100.    Throughout the relevant period, Medicare paid home health providers under what is known as the Health Insurance Prospective Payment System ("HIPPS").

101.    Under the HIPPS, home health agencies receive a set amount per Medicare patient to provide all necessary home health services for up to 60 day "episodes" of care.

102.    The HIPPS rate is intended to reimburse the home health agency for all reasonable and necessary nursing and therapy services, routine and non-routine medical supplies, and home health aide and medical social services required for the care of an individual patient during that sixty days.

103.    The amount of the payment for each sixty-day episode of care is adjusted to account for the patient's health condition, clinical characteristics, and service needs.  Similarly to SNFs, home health agencies submit claims for reimbursement to Medicare utilizing a Form

CMS-1450, also known as a "UB-04." Every Form CMS-1450 contains the following certifications and acknowledgements:

> Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts.

> The submitter of this form understands that misrepresentation or falsification of essential information as requested by this form, may serve as the basis for civil monetary penalties and assessments and may upon conviction include fines and/or imprisonment under federal and/or state law(s).

104.    In order to be paid for services furnished to Medicare beneficiaries, a home health agency must file an annual cost report with the relevant MAC. 42 C.F.R. § 405.1801(b)(1). The cost report contains certain provider information, including utilization data, cost data and HIPPS payment data.

### C. Medicare Participation

105.    In order to participate in the Medicare program, home health agencies and skilled nursing facilities like Defendants must periodically sign an application to participate in the program. The application must be signed by an authorized representative of the provider, and contains a certification statement that reads:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

106.    Once a provider has been accepted as a participant in the Medicare program, it must enter into an Electronic Data Interchange ("EDI") Enrollment Agreement.

107.    As part of that EDI Enrollment Agreement, providers agree to "submit claims that are accurate, complete, and truthful." In signing the EDI Enrollment Agreement, Medicare

providers acknowledge that "all claims will be paid from Federal funds, that the submission of

such claims is a claim for payment under Medicare, and that anyone who misrepresents or

falsifies or causes to be misrepresented or falsified any record or other information relating to

that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine

and/or imprisonment under applicable Federal law."

108.    Defendants submitted CMS form 1450 and cost reports to the MAC (First Coast

Service Options) for each year during the relevant period.

109.    The first page of the cost reports submitted by Defendants during the relevant

period contain the following language in a section titled "Certification:"

> Misrepresentation or falsification of any information contained in this cost report
> may be punishable by criminal, civil and administrative action, fine and/or
> imprisonment under federal law. Furthermore, if services identified in this report
> were *provided or procured through the payment directly or indirectly of a
> kickback* or were otherwise illegal, criminal, civil and administrative action, fine
> and/or imprisonment may result. (Emphasis added.)

110.    In addition, in order to submit a complete cost report, and thereby remain eligible

to receive Medicare payments, an officer or director is required to complete the Certification

section of the cost report by signing the following statement each cost report year:

> I HEREBY CERTIFY that I have read the above certification statement and that I
> have examined the accompanying electronically filed or manually submitted
> Home Health Agency Cost Report and the Balance Sheet and Statement of
> Revenue and Expenses prepared by (Provider Name(s) and number(s)) for the
> cost report period . . ., and that to the best of my knowledge and belief, this report
> and statement are true, correct, and complete and prepared from the books and
> records of the provider . . . . I further certify that I am familiar with the laws and
> regulations regarding the provision of health care services, and that the services
> identified in this cost report were provided in compliance with such laws and
> regulations.

111.    Defendants were required to certify that their respective cost reports as filed with

First Coast Service Options were (1) truthful, *i.e.,* that the cost information contained in every

report was true and accurate; (2) correct, *i.e.,* that they were entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, *i.e.,* that the cost reports were based upon all information known to Defendants; and (4) that the services identified in the cost reports were not corrupted by kickbacks, were billed in compliance with the Stark Law, and were otherwise provided in compliance with all applicable health care laws and regulations.

### D. Obligation to Refund Overpayments

112.    As another condition to participation in the Medicare Program, providers are affirmatively required to disclose to their fiscal intermediaries any inaccuracies of which they become aware in their claims for Medicare reimbursement (including in their cost reports).  42 C.F.R. §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C. See also 42 C.F.R. §§ 489.40, 489.31.  In fact, under 42 U.S.C. § 1320a-7b(a)(3), providers have a clear, statutorily-created duty to disclose any known overpayments or billing errors to the Medicare carrier, and the failure to do so is a felony.  Providers' contracts with CMS carriers or fiscal intermediaries also require providers to refund overpayments. 42 U.S.C. § 1395u; 42 C.F.R. § 489.20(g).

113.    Accordingly, if CMS pays a claim for medical goods or services that were not medically necessary, a refund is due and a debt is created in favor of CMS.  42 U.S.C. § 1395u(l)(3).  In such cases, the overpayment is subject to recoupment.  42 U.S.C. § 1395gg. CMS is entitled to collect interest on overpayments. 42 U.S.C. § 1395l(j).

114.    Providers who learn that their prior claims submissions were in violation of AKS and/or Stark laws are obligated to inform CMS and repay claims related to those violations.  42 C.F.R. § 411.353

### VI.    Other Federally-Funded Health Care Programs

115.    Although false claims to Medicare are the primary FCA violations at issue in this

case, the patients who were subjected to the medically unnecessary procedures that are the subject of this action were beneficiaries of one of three federally-funded health care benefit programs – Medicare, Medicaid, or TRICARE. Accordingly, those other two programs are briefly discussed as well.

116.    The Medicaid Program, as enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, et seq., is a system of medical assistance for indigent individuals. CMS administers Medicaid on the federal level while the individual states administer the program on the state level. Reimbursement of hospital costs or charges is governed by Part A of Medicare, through the hospital cost report system, and reimbursement of physician charges is governed by Part B of Medicare. As with the Medicare Program, hospitals and physicians may, through the submission of cost reports and health insurance claim forms, recover costs and charges arising out of the provision of appropriate and necessary care to Medicaid beneficiaries.

117.    TRICARE is a federal program, established by 10 U.S.C. §§ 1071-1110, that provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents. Although TRICARE is administered by the Secretary of Defense, the regulatory authority establishing the TRICARE program provides reimbursement to individual health care providers applying the same reimbursement requirements and coding parameters that the Medicare program applies. 10 U.S.C. §§ 1079(j)(2) (institutional providers), (h)(1) (individual health care professionals) (citing 42 U.S.C. § 1395, et seq.). Like Medicare and Medicaid, TRICARE will pay only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. § 199.4(a)(1)(i). And, like the Medicare Program and the Medicaid Program, TRICARE prohibits practices such as submitting claims for services that are not medically

necessary, consistently furnishing medical services that do not meet accepted standards of care, and failing to maintain adequate medical records. 32 C.F.R. §§ 199.9(b)(3)-(b)(5).

## VII.   THE ANTI-KICKBACK STATUTE (AKS)

118.   The AKS arose out of Congressional concern that providing things of value to those who can influence healthcare decisions may corrupt professional healthcare decision-making and result in federal funds being diverted to pay for goods and services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

119.   In particular, the AKS prohibits any person or entity from offering, making, or accepting payment to induce or reward any person for referring, recommending, or arranging for the purchase of any item for which payment may be made in whole or in part by a federal health care program.  The statute provides, in pertinent part:

(b) Illegal remunerations

(1)      Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

(A)      in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B)      in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

    (2)    Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person-

        (A)    to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

        (B)    to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both. 42 U.S.C. § 1320a-7b(b)."

120.    The AKS not only prohibits outright bribes, it also prohibits any remuneration by a home health agency or SNF to a physician that has, as one of its purposes, inducement of the physician's referrals to the home health care company or SNF.

121.    Claims that are submitted to Medicare in violation of the AKS are false or fraudulent under the FCA. See 42 U.S.C. §1320a-7b(g) (incorporating FCA amendment clarifying that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA].").

122.    The AKS has a number of statutory and regulatory safe harbors, including the "Personal Services and Management Contracts" safe harbor. 42 C.F.R § 1001.952(d). In order to qualify for this safe harbor, a defendant must demonstrate, among other things, that the aggregate compensation to be paid over the term of the agreement is consistent with fair market value in an arms-length transaction, and is not determined in a manner that takes into account the value or volume of any referrals or business otherwise generated between the parties. *Id.*

123.    In addition, a defendant must show that the agreement does not pertain to services that involve the counseling or promotion of a business arrangement or other activity that violates

State or Federal law, and provides for services that are reasonably necessary to accomplish the commercially reasonable business purpose of the services. *Id.*

## VIII.   THE STARK LAW

124.   Enacted as amendments to the Social Security Act, the Stark Law prohibits an entity from submitting a claim to Medicare for "designated health services" that were referred to the entity by a physician who has a "financial relationship" with the entity, unless a statutory exception applies. 42 U.S.C. §§ 1395nn.

125.   The Stark Law is a strict liability statute, and was designed specifically to prevent losses that might be suffered by the Medicare program due to questionable utilization of designated health services.

126.   In particular, the Stark Law provides, in pertinent part:

(a) Prohibition of certain referrals

(1) In general

Except as provided in subsection (b) of this section, if a physician . . . has a financial relationship with an entity specified in paragraph (2), then -
(A)   the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B)   the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).  42 U.S.C. § 1395nn(a)(1).

127.   "Designated health services" include clinical laboratory services; physical therapy services; occupational therapy and speech-language pathology services; radiology services, including nuclear medicine, MRI, CAT scans, and ultrasound services; radiation therapy services and supplies; durable medical equipment and supplies; parenteral and enteral nutrients, equipment and supplies; prosthetics, orthotics, and prosthetic devices and supplies; home health

services; outpatient prescription drugs; and inpatient and outpatient hospitalization services. 42 U.S.C. § 1395nn(h)(6).

128.    A "financial relationship" includes a "compensation arrangement," which means any arrangement involving any remuneration paid directly or indirectly to a referring physician. *See* 42 U.S.C. §§ 1395nn(h)(1)(A) and (h)(1)(B).

129.    The Stark Law explicitly states that Medicare will not pay for designated health services billed by a healthcare provider when the designated health services resulted from a prohibited referral. *See* 42 U.S.C. § 1395nn(g)(1).

130.    In addition, the regulations implementing the Stark Law expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353 (2006).

131.    The Stark Law and its companion regulations contain exceptions for certain compensation arrangements. These include exceptions for "Personal Services Arrangements," 42 U.S.C. § 1395nn(e)(3), 42 C.F.R. § 411.357(d), and for "Fair Market Value Compensation," 42 C.F.R. § 411.357(l).

132.    Like the "Personal Services and Management Contracts" safe harbor under the AKS, both the "Personal Services Arrangements" and the "Fair Market Value Compensation" exceptions to the Stark Law require, among other things, that: (1) the compensation be consistent with fair market value, and not determined in any manner that takes into account the volume or value of the physician's referrals; (2) the arrangement be "commercially reasonable" and further the legitimate business purposes of the parties; and (3) the services performed under the arrangement not involve the counseling or promotion of a business arrangement or other activity that violates a Federal or State law. 42 U.S.C. § 1395nn(e)(3), 42 C.F.R. §§ 411.357(d), (l).

## FIRST CAUSE OF ACTION
False Claims Act: Presentation of False Claims 31 U.S.C. § 3729(a)(1)
(claims up to and through May 19, 2009) and 31 U.S.C. § 3729(a)(1)(A)
(claims from and after May 20, 2009)

133.    Relator repeats and incorporates by reference the allegations contained in paragraphs 1- 132 of this Complaint as if fully set forth herein.

134.    Defendants knowingly presented, and caused to be presented, false or fraudulent claims for payment or approval to the United States for skilled nursing, rehabilitation and home health services that were false as a result of illegal kickbacks.

135.    Defendants knowingly presented, and caused to be presented, false or fraudulent claims for payment or approval to the United States by submitting claims for skilled nursing, rehabilitation, and home health services that were the product of referrals from physicians with whom Defendants had an illegal financial relationship, and were therefore not reimbursable by Medicare.

136.    Defendants knowingly presented, and caused to be presented, false or fraudulent cost reports claiming payment for claims submitted in furtherance of the kickback scheme and in violation of the Stark Law.

137.    By virtue of the false or fraudulent claims that Defendants made and/or caused to be made, the United States suffered damages and is therefore entitled to treble damages under the FCA, to be determined at trial, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

## SECOND CAUSE OF ACTION
False Claims Act: Presentation of False Statements
Material to False Claims (31 U.S.C. § 3729(a)(1)(B))

138.    Relator repeats and incorporates by reference the allegations contained in paragraphs 1-132 of this Complaint as if fully set forth herein.

139.    Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims and to get such claims paid by the United States with respect to home health care services that were ineligible for reimbursement as a result of illegal kickbacks.

140.    Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims and to get false or fraudulent claims paid by the United States with respect to home health services that were the product of referrals from physicians with whom Defendants had an illegal financial relationship.

### THIRD CAUSE OF ACTION
False Claims Act: False Record Material to Obligation to Pay
(31 U.S.C. § 3729(a)(1)(G))

141.    Relator repeats and incorporates by reference the allegations contained in paragraphs 1-132 of this Complaint as if fully set forth herein.

142.    Defendants made and used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States.

143.    Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

### FOURTH CAUSE OF ACTION
False Claims Act: Conspiracy to Submit False Claims
31 U.S.C. § 3729(a)(1)(C)

144.    Relator repeats and incorporates by reference the allegations contained in paragraphs 1-132 of this Complaint as if fully set forth herein.

145.    Defendants entered into illegal agreements with referring physicians and conspired to defraud the United States by submitting false or fraudulent claims for

reimbursement from the United States, acting through its programs, Medicare, Medicaid, and

other government sponsored insurance programs, for money to which they were not entitled, in

violation of 31 U.S.C. § 3729(a)(1)(C) (2012).

146.    Acting in concert, Defendants Conway Lakes Health & Rehabilitation Center,

Clear Choice Health Care, Geoffrey Fraser, Jeffrey Cleveland and Matthew File entered into

illegal agreements with referring physicians in order to submit or cause to be submitted false or

fraudulent claims to the United States.

147.    By virtue of Defendants' conspiracy to defraud the United States, the United

States suffered damages and therefore is entitled to treble damages under the False Claims Act,

plus a civil penalty for each claim of not less than $5,500 and not more than $11,000, as adjusted

by the Federal Civil Penalties Inflation Adjustment Act of 1990.

**Prayer for Relief**

WHEREFORE, Relator, on behalf of the United States, demands judgment against

Defendants as to Counts I-IV of the Complaint, as follows:

A.  That Defendants cease and desist from violating 31 U.S.C. §3729 *et seq.* and the
    equivalent provisions of the state statutes set forth above.

B.  That this Court enter judgment against Defendants in an amount equal to three times the
    amount of damages the United States government has sustained because of Defendants'
    actions, plus a civil penalty of $11,000 for each false claim, together with the costs of
    this action, with interest, including the cost to the United States government for its
    expenses related to this action.

C.  That this Court enters judgment against Defendants for the maximum amount of actual
    damages under 31 U.S.C. §3729 *et seq.*

D.  That Relator be awarded all costs incurred, including his attorneys' fees.

E.  That the United States and Relator receive all relief, both in law and in equity, to which
    they are entitled.

**DEMAND FOR JURY TRIAL**

Relator demands a jury trial in this case.

Dated July 28, 2016

Respectfully submitted,

BY: _____

John Yanchunis (FBN 324681)
jyanchunis@forthepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 North Franklin Street, 7th Floor
Tampa, Florida  33602
(813) 318-5169 Telephone

James D. Young (FBN 567507)
jyoung@forthepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
76 S. Laura St., Suite 1100
Jacksonville, FL 32202
(904)361-0012 Telephone

*Attorneys for Plaintiff/Relator*